# EXHIBIT O



411 University St.<br>
Suite 1200<br>
Seattle, WA 98101<br>
p: (206) 374-8500<br>
mike@psbizlit.com

April 22, 2020

*Via Email*

| | |
|---|---|
| Kelly Mennemeier | Sheeba Roberts |
| Ben Hodges | Anne Cohen |
| Foster Garvey | Betts Patterson Mines |
| 1111 Third Avenue, Suite 3000 | 701 Pike Street, Suite 1400 |
| Seattle, WA 98101-3292 | Seattle, WA 98101 |

    Re:    *Universal Life Church Monastery Storehouse v. Maurice King, et. al.*

Anne:

    We appreciate you and your co-counsel getting on the call Friday, and for your time and effort. Thank you also for your letter Monday in response. As we said in the call Friday, ULC Monastery could and would produce documents, and our intent and effort was and is to work to find a quicker and efficient way to get AMM what is truly relevant and important given our objections to the discovery AMM has launched in the last month or so before the deadline.  Unfortunately, your letter misstates much of our conference, and instead reads as an *ex post facto* characterization to create (if not fabricate) a record.

**AMM's Massive Discovery**

    We never said we "don't have a list of what AMM has requested" or "that the requests are too detailed" (pg. 2, ¶3 of letter). Rather, the point of the conference was to address the massive discovery AMM launched at the 11th hour of discovery:  166 requests, 13 subpoenas duces tecum to third parties, 5 subpoenas for depositions of third parties, and deposing what was an initial list of at least 15 witnesses[1]. This followed our conference on April 3, in which we identified the specific factors as to proportionality under Rule 26(b)(1). On Monday April 13, we requested another conference on this subject, and we all agreed to later last week, as we were faced with the deposition of AMM over two days (Tuesday and Wednesday, Apr. 14-15). Mike Matesky then sent an email on Thursday, April 16 outlining the subjects.

---

[1] With Ms. Roberts email of Thursday, April 16 at 9:08pm, and read Friday, it appears Defendants might possibly be reducing the number of depositions to 10, although that is not entirely clear to us.

What we said at the outset of the conference on Friday was to ask what information and documents, from AMM's perspective, was most important or most relevant to AMM. This was to find a quicker and more efficient means to get AMM what truly mattered, and avoid disputes and motion practice over ULC Monastery's objections as to massive discovery. Thus, we offered to see if ULC Monastery could produce those documents AMM identified for us. So, our communications, both written and oral, never included "not having a list" or that AMM's requests "are too detailed."

To our request, you said the documents can be put into two categories, "data and analytics" and financial information. We will address each in turn:

"Data and Analytics"

Your letter now uses the term "web data," but we are not sure if you intended a distinction or not. You first said nothing had been provided. We corrected this and pointed to the "Google analytics" documents provided in August 2019. Those documents provide detailed information for all three webpages AMM identified in its Counterclaim on which it bases those Counterclaims. These documents provide detailed information as to the "web traffic," e.g. number of visitors, number of sessions, pages per session, duration of session, bounce rate, etc. The documents also provide detailed information as to purchases made, including total sales, conversion rate, number of transaction, etc. You downplayed the information as a single "report" that did not provide everything.

We asked what other information is AMM seeking. Your answer was "the data behind the data" (your exact words). We both tried several times to understand what you meant by "the data behind the data," and what other data there may be. You were unable to clarify or be more specific, and said that since we were "experienced counsel," we "should know." Despite our efforts, we do not know what you mean, and your letter of April 20 is absent of any further specifics or clarification.

Later, toward the very end of our conference, you seemed to relent, saying you would talk to your client and asked that we talk to ours about the specific data. This was in part because AMM's two designees both testified as to looking at and relying upon the information in Google analytics for their testimony regarding web traffic and alleged "financial damage." So, our understanding was counsel would talk to their respective clients about the "data behind the data" and re-confer. In hindsight, after reading your letter, perhaps we were too optimistic with your statements.

We did discuss with ULC Monastery your statement about "the data behind the data." It likewise did not understand what you meant, or to what you may have been referring to. The data that was used to generate the documents we previously provided is reflected in those documents. Any data that is not reflected in those documents was not used to generate those documents. ULC Monastery let us that know that while there is other data available, that data is unrelated to any potential legal claim, such as the type of browser used (Firefox, Chrome, Edge, etc.), and was not used to generate the documents we provided nor is otherwise relevant to the information contained therein. ULC Monastery said that if you can be more specific as to what data you were referring to, or what specific data AMM is really after, it will review Google analytics as to what is available and provide what relevant data it can.

ULC Monastery will provide this week Google analytics data (the same categories previously provided) for all 13 webpages identified in its supplemental response to AMM's Interrogatory No. 11. The reports will be be for all 13 webpages, so will include updated (current) data for those pages previously provided last August. As above, the reports will contain the same detailed information as to the "web traffic" (e.g. number of visitors, number of sessions, pages per session, duration of session, bounce rate, etc.), and the same detailed information as to purchases made (e.g. including total sales, conversion rate, number of transaction, etc.).  This provides AMM full and detailed information as to all webpages that use the phrase "American Marriage Ministries."

We re-ask and encourage you to identify what specific information or data AMM is seeking that is different from these Google analytics reports for the 13 webpages. One or both of us can adjust our schedules to get on a call this week, so if you provide a couple times we will confirm, and we can have a short call to hopefully resolve this.

Financial Data

As to our request what financial information is truly relevant to AMM, you listed five documents: tax returns, balance sheets, profit/loss statements, audited financial statements, and a general ledger. We spoke with our client, and ULC Monastery does not create or use many of these. While it has a "ledger" in the broad, generic sense, such records would include every single debit and credit, by each specific item and the specific amount for each item. We do not believe all of that information is relevant and proportional under Rule 26(b)(1) and would be incredibly invasive, even with an AEO designation. Simply having a Protective Order does not and should not expand what is permissible and proper discovery under the Fed.R.Civ.P.  As you said, AMM does not truly need the data at the "granular of a level."

We continue to dispute the relevance of ULC Monastery's aggregate financial information to the claims actually asserted in this litigation, and the value of such information given the needs of the case. ULC Monastery has repeatedly stated in discovery responses that it is not seeking recovery of damages based on its own lost sales or profits, so such data is not relevant to ULC Monastery's claims. AMM's claims are based on conduct occurring on or through a specific site (americanmarriageminisries.com) and specific web pages constituting a sliver of ULC Monastery's overall activity. ULC Monastery has or is providing Google analytic reports for all of those, which will list the detailed financial data as to the purchases made. However, ULC Monastery's aggregate financial data, including access to all ledger entries, for an 11 year period, without any nexus to the conduct underlying AMM's claims, is neither relevant nor proportional to the needs of the case and amount in controversy.

Summary

Through our two conferences, as well as our written communications, we have conveyed that ULC Monastery objects to the massive discovery AMM sent over the past month, as well as the scope of those requests and subpoenas. We have attempted to ascertain what information AMM truly seeks so we could provide that in lieu of responding to massive discovery at the 11th hour and the undue burden that would create. However, in the conference, you said that all discovery requests stand and AMM will not withdraw any. That

only after ULC Monastery provides documents will AMM even evaluate whether to reduce the scope of any request or withdraw any request. As we pointed out and explained, that would be incredibly inefficient, because it would have ULC Monastery try to guess what AMM truly seeks or what AMM funds most relevant in this action.

We are willing to confer further, but at this point it appears to us the parties are at an impasse as to the scope of AMM's massive discovery. We plan on moving the Court for relief, but if you believe further discussion may bring about a compromise or reduction in scope, please do let us know today or tomorrow.

**Video Depositions**

We appreciate your request, but at this time ULC Monastery is not agreeing to extend the discovery deadline. We disagree with your characterization of the process thus far. It did not take 11 hours to obtain 7. The process seemed to work sufficiently well for all involved, except Mr. Yoshioka. His internet connection apparently was insufficient. The challenges he faced were not repeated on the second day with Mr. Lewis. However, as we go forward, we can revisit this issue and decide on a case by case basis.

**Topics of Rule 30(b)(6) Dep of AMM**

None of the topics are withdrawn, and you should not assume otherwise or try to make them so via letter subsequent to the deposition. We designated the topics in good faith, with reasonable particularity as stated in Rule 30, and deposed AMM's designees as best we could.

We also received your email this morning now asking for a conference as to the 14 topics for which AMM did not produce a designee. Your email states AMM made "prior requests" for a conference. From our review of the communications and our notes, the only prior request we could locate was on Monday, April 13 on the eve of the Rule 30(b)(6) deposition scheduled for April 14-15. Neither your March 20 letter providing AMM's objections, nor your April 7 or 9 emails mention a conference. Ms. Mennemeier's April 13 email mistakenly claims that we said we were unprepared to confer earlier that day, which is not true. Rather, we said that it was AMM's obligation to move for relief if it believed it needed to do so, but did not refuse to discuss the matter.

Preferably, AMM would have sought a conference before the day before the deposition (indeed, AMM had the list of topics five+ weeks prior). However, now that AMM would like to confer, we of course are willing to do so. While we can confer in the next few days as to AMM's objections to the 14 topics, we propose doing so after both sides first have the transcript of the deposition. We would like to confer as to the designees' inability to answer about topics for which they were designated. We first need the transcript, but it appeared to us that the two designees did not meet the duty to prepare. It seems better to us to confer about the deposition all at once. Let us know your thoughts if this is acceptable, or if you prefer to first confer as to the lack of designation for the 14 topics. If the latter, please provide 2-3 times and we will coordinate our schedules to the one that works.

//
//

Thanks for your time and attention to this letter.

Sincerely,

**PUGET SOUND BUSINESS & LITIGATION**

*Michael B. Galletch*

Michael B. Galletch


cc:  Mike Matesky
     ULC Monastery Storehouse