# EXHIBIT T



# Memo of Senior Judge Curtis E von Kann

**This webpage is** not affiliated with American Marriage Ministries, located online at http://www.theamm.org (http://www.theamm.org).

Below is the text of a Memorandum Order issued by the Senior Judge for the Superior Court in Washington, D.C. The Order was published by the newlyweds whose application was initially denied. Their personal information has been removed, and the formatting of the Order has not been preserved. The language below, the couple said, exists as it was issued by the Washington D.C. Court (except where otherwise noted in brackets [ ] ).

Superior Court of the District of Columbia
Family Court
[Name and case number]

Memorandum Order

[Name of officiant] has filed an application for authorization to celebrate marriages in the District of Columbia pursuant to Section 46-406, DC Code (2001 ed.) which provides, in pertinent part, as follows:

*(a) For purposes of this section, the term:*
*(1) "Religious" includes or pertains to a belief in a theological doctrine, a belief in and worship of a divine ruling power, a recognition of a supernatural power controlling man's destiny, or a devotion to some principle, strict fidelity or faithfulness, conscientiousness, pious affection, or attachment.*
*(2) "Society" means a voluntary association of individuals for religious purposes.*
*(b) For the purpose of preserving the evidence of marriages in the District of Columbia, every minister of every religious society approved or ordained according to the ceremonies of his religious society, whether his residence is in the District of Columbia or elsewhere in the United States or the territories, may be authorized by any judge of the Superior Court of the District of Columbia to celebrate marriages in the District of Columbia.*

For some time, judges of this Court have been struggling to determine just how "religious" the religious society needs to be to qualify under the foregoing statute. The question has typically arisen in connection with applications filed by purported "ministers" of the Universal Life Church. Some judges have concluded that Universal Life Church ministers should not be authorized to celebrate marriages in the District of Columbia. see, e.g., In re Dixon, Mis. No. 119-81, 109 WLR 2405, Oct. 29, 1981 (Wolf, J.), while others have concluded that they should, see, e.g., In re Stack, DR No. 3100-98M, 126 WLR 2061, Oct. 5 1998 (Wertheim, J.).

According to Wikipedia, ULC was founded by an interesting individual named Kirby J. Hensley. Hensley was born in Lowgap, North Carolina in 1911 and, although he remained illiterate all his life,

PAGE 1

developed a keen interest in religion from having people read the Bible to him. He became ordained as a Baptist minister but found that Church too rigid for his taste. He started attending various Pentecostal Churches and pastored in Oklahoma and California. Hensley became convinced that traditional churches were too narrow and

Exhibit T 1

https://www.americanmarriageministries.com/

parochial in their theologies and that all persons should be able to follow their own beliefs. In 1959 he formed the Universal Life Church in his garage in Modesto, California. Five years later he moved into a large facility in Modesto and began attracting significant adherents.

ULC, whose only creed is "Do only that which is right," grew rapidly by appealing to those who liked its non-restrictive perspective, somewhat similar to that of the Unitarian Universalist Church, but did not agree with the liberal social activism of Unitarians. Many California celebrities eventually joined the Church, including Ray Bolger, Rosalind Russell, Doris Day, Mae West, Jimmy Steward [sic], Doris Day [repeat in original], Paul Newman, Debbie Reynolds, Barbara Streisand, Lawrence Welk, John Lennon, and Johnny Carson. Hensley eventually became something of a celebrity himself. He authored many sermons, appeared on "60 Minutes," ran for President of the U.S. twice (in 1964 and 1968), and was the subject of a song ("Modesto Messiah") written by Jonathan Newton and recorded by David Rayner.

In the 1960's and 1970's, large numbers of people became ordained as ULC ministers under the mistaken impression that doing so would spare them from being drafted for the Viet Nam [sic] war and exempt them from federal income taxes. Various organizations, some affiliates of ULC and others independent branches, began operating under various names that included ULC, e.g., the Universal Life Church Monastery, the Universal Life Church Seminary, and the Universal Life Church Storehouse.

Upon Hensley's death in 1999, his wife Lida succeed [sic] him as ULC's President. Lida died in 2006 and was succeeded as President by her son Andre Hensley, who still holds that position. The ULC Headquarters Church holds weekly church services in Modesto. Over the years, according to a recent ULC press release, ULC has championed various social issues including freedom of religion and speech, gay rights, and other minority issues and has also funded such diverse charitable causes as autism, battered women, homeless shelters, soup kitchens, and educational grants for minority students.

PAGE 2

Kirby Hensley apparently believed that anyone who wished to become a ULC minister should be able to do so without passing some sort of litmus test of particular beliefs. Thus, ULC began freely ordaining numerous ministers, eventually through easy internet procedures. The Church now claims to have 20,000 ordained ministers worldwide. Though ULC ordination has always been free, at some point the Church began to take on a pronounced commercial character. Those who were ordained on line were encouraged to purchase various "products" from the Universal Life Church Monastery. These include several forms of printed marriage certificates ($8.99 each), letters attesting to the minister's good standing in the Church ($18.99), a "classic wedding package" of materials ($49.99), a wedding officiant package ($99.99), and the complete "ministry in a box" package ($139.99). One can also purchase from the Monastery website gowns, communion wafers, and sacramental wines. There is even a button to push to obtain "Absolution from Sin."

Thus, it seems that ULC began with, and retains to some degree, a sincere belief in equality and universality of belief systems but now also bears a heavy commercial, for-profit aspect. While that aspect may be distasteful to many in more "mainstream" religions, it is hardly unique to ULC, as anyone who has watched certain televised evangelists can attest.

Recently, this Court has started receiving applications for wedding celebration authority from persons who, like the instant petitioner, assert that they are ordained ministers of the American Marriage Ministries ("AMM"). According to its website, AMM was founded in 2009 by several former ULC staff members. They seem to have brought to their new venture all of the commercial fervor of ULC without even a vestige of a belief system. Thus, AMM sells products comparable to those of UCC, and at comparable prices. However, it professes to have no beliefs or principles of its own, not even something as elementary as "Do only that which is right." Instead, on its FAQ page, in response to the question "What are your beliefs?" the AMM answer is as follows:

American Marriage Ministries is a non-denominational church. Of its three officers, one is Presbyterian, one Jewish, and the other Agnostic. This collaboration is built on the belief that our church exists primarily for the intent of helping all people regardless of beliefs.

*AMM is built on the simple belief that all people have the right to engage in the marriage contract, that all people have the right to administer the marriage contract, and that it is the right of the couple to choose the person officiating their wedding.*

Exhibit T 2

https://www.americanmarriageministries.com/

To the extent that the foregoing may be considered a "belief," it is not one countenanced by the DC Code section at issue. Rather than endorsing the notion that all people have the right to administer the marriage contract, District of Columbia law affords that authority only to members of a "religious society" that meets the requirements of the statute.

The AMM website Media page contains an entry from a young woman in California who decided that she wanted to have her "goofiest brother" conduct her marriage ceremony. She went online to find a few service [sic]. She "rejected Universal Life Ministries as having a smidge too much preachiness and miscellaneous fees that I didn't want to pay." Instead, she selected AMM because ordination there was totally free and it adhered to the notion that "the right to perform marriage belongs to all people."

In the District of Columbia at least, the right to perform marriage does *not* [emphasis in original] belong to all people. Instead, it belongs to certain designated public officers, who can perform non-religious, civil weddings, and to ordained ministers of religious societies which maintain a belief in some theological doctrine or a devotion to some principle. The American Heritage Dictionary (4th ed. 2001) provides the following pertinent definitions of "principle:" "a basic truth, law or assumption; a rule or standard, esp. of good behavior; moral or ethical standards or judgments."

*Clearly Superior Court judges, in applying DC Code 46-406, should not undertake to declare which theological doctrines or moral principles are acceptable and which are not. However, in my view, that statute requires that the "religious society" whose "minister" seeks authority to perform DC marriages must subscribe to some theological doctrine or moral principle. In the case of the instant petitioner, I see no evidence that the American Marriage Ministries is such a society.*

Accordingly, for the reasons set forth above, [officiant]'s application for authorization to celebrate marriages in the District of Columbia is DENIED.

May 25, 2012

[signature]
Senior Judge Curtis E. von Kann

 Hon. Curtis E. von Kann (Ret.)

©

Exhibit T 3