UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNIVERSAL LIFE CHURCH MONASTERY STOREHOUSE,<br><br>Plaintiff,<br><br>v.<br><br>MAURICE KING, *et al.*,<br><br>Defendants. | NO. C19-0301RSL<br><br>ORDER GRANTING IN PART ULC'S MOTION FOR SUMMARY JUDGMENT ON AMM'S COUNTERCLAIMS |

This matter comes before the Court on Universal Life Church Monastery Storehouse's "Motion for Partial Summary Judgment" regarding defendant American Marriage Ministries' counterclaims. Dkt. # 114. Universal Life Church Monastery Storehouse ("ULC") and American Marriage Ministries ("AMM") are rivals: they both provide on-line ordination services, generating sales and revenue through various websites. ULC filed this lawsuit accusing AMM of making false, defamatory, and/or misleading statements regarding ULC and asserting violations of the Lanham Act and the Washington Consumer Protection Act ("CPA"), as well as a defamation claim. AMM filed counterclaims based on allegations that ULC used the url www.americanmarriageministries.com to drive traffic to ULC's website, spread false and defamatory statements, and confuse consumers, it used AMM's trademark without permission

ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 1

for unfair and unlawful purposes, and it made false or misleading statements regarding AMM or its services/products. ULC seeks summary dismissal of all of AMM's counterclaims.

**A. Trademark-Related Claims**

ULC argues that AMM's common law trade libel, common law trademark, and Lanham Act trademark claims were untimely filed, that AMM has no protectable rights in the mark "American Marriage Ministries," and that its use of AMM's mark is non-infringing. These arguments are considered below.

**1. Statutes of Limitations**

The parties agree that AMM's state law counterclaim of trade libel is subject to a two-year statutory limitations period and that the state law trademark claim is subject to a three-year limitations period. ULC correctly points out that AMM failed to timely assert these claims to the extent they arise out of ULC's use of the www.americanmarriageministries.com domain name.[1] AMM was aware that ULC was using its mark as a url by mid-2014 when it complained to the domain host about the unauthorized use. AMM chose not to assert a claim at that time, however, because "ULC's Fake AMM Site had a poor position in online search results[, it] did not visibly damage AMM," and AMM hoped to avoid litigation with ULC. Dkt. # 122 at 6 and 8. Because AMM knew of ULC's unauthorized use of its mark as a domain name more than two or three years prior to the filing of its counterclaims, its common law trade libel and trademark claims are time-barred to the extent they are based on that use.

---

[1] Between 2011 and 2015, ULC used the www.americanmarriageministries.com url to redirect internet users to its own website, to maintain a website that masqueraded as AMM, and/or to publish allegedly false, misleading, or defamatory information regarding the relationship between the two organizations and the legal validity of AMM's ordinations.

ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 2

ULC did not, however, content itself with utilizing AMM's mark as a domain name. Rather, beginning in 2018, ULC developed and implemented a campaign to use AMM's mark in new ways to achieve new goals. There is evidence in the record from which a reasonable jury could conclude that, starting in or around 2018, ULC began using the mark in the visible content of its webpages and in metadata in order to dilute the mark's association with AMM, to misdirect search engines, and to sow confusion among consumers. Dkt. # 123-12 at 2 (June 2018 internal ULC emails referring to changes to metadata and visible website content "optimized for the terms 'american marriage ministries' and 'american ministries'"); Dkt. # 123-13 at 2 (undated internal ULC messages noting that it "would be fun" to create three new webpages which use "american marriage ministries" and "american ministries" as "generic terms" to "see if we can chip away a bit at them"). These efforts were apparently successful, causing AMM escalating competitive injury. AMM could not have petitioned the court for relief prior to the time ULC initiated these wrongful uses of AMM's mark. Because these events occurred within the applicable limitations periods, they remain actionable under the common law. *See Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc*., 166 Wn.2d 475, 485 (2009), as corrected (Sept. 22, 2009) ("Generally, a statute of limitation runs from the time a claim accrues; a claim accrues when a party has the right to apply to a court for relief, which may be at the time the claim is discovered.").[2]

---

[2] Given the facts of this case, the Court need not determine whether the discovery rule applies, whether a continuing-tort theory applies to state law trademark-related claims, or whether AMM has shown good cause for a continuance under Fed. R. Civ. P. 56(d) in order to resolve the statutes of limitations argument.

ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 3

1

2 **2. Laches**

3 Laches is an equitable defense designed to prevent a plaintiff who, "with full knowledge

4 of the facts, acquiesces in a transaction and sleeps upon his rights." *Hayward v. Eliot Nat'l Bank*,

5 96 U.S. 611 (1877). Where an analogous state law limitations period has expired, there is a

6 strong presumption of delay that favors a finding of laches: the presumption is reversed if the

7 statutory limitations period has not yet expired. *Tillamook Country Smoker, Inc. v. Tillamook*

8 *Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). Once delay is presumed or

9 established, the party asserting laches has the burden of proving both that the delay was

10 unreasonable and that it suffered prejudice as a result. *Id*.; *Jarrow Formulas, Inc. v. Nutrition*

11 *Now, Inc*., 304 F.3d 829, 835 (9th Cir. 2002); *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078,

12 1083 (9th Cir. 2000). *See also Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952-55 (9th Cir. 2001)

13 (identifying and discussing three elements of laches: delay, reasonableness of the delay, and

14 prejudice).

15

16 The Court presumes, for purposes of this motion, that AMM delayed in filing its Lanham

17 Act claims arising out of ULC's use of its mark as a domain name.[3] AMM was aware of that use

18 more than four years before it filed its counterclaims, but chose not to assert the claim at that

19 time. ULC has not, however, met its burden of showing, as a matter of law, that the delay was

20 unreasonable or that it caused ULC prejudice.

21

22 An infringement claim under the Lanham Act generally requires the trademark owner to

23 demonstrate "that the alleged infringer's use of the mark is likely to cause confusion, or to cause

24

25 ───────────

     [3] The analogous statutes of limitations have not expired and ULC has not shown delay as to the
26 Lanham Act claims arising out of ULC's subsequent campaign to dilute AMM's mark and confuse
consumers regarding AMM's association with the mark and with ULC.

27

28 ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 4

mistake, or to deceive consumers." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006) (citation and internal quotation marks omitted). The Ninth Circuit has cited with approval cases finding that a plaintiff should not be required to sue until it knows or should have known of a provable infringement claim, which requires more than a merely theoretical likelihood of confusion. *Tillamook Country Smoker*, 465 F.3d at 1108 (citing *ProFitness Physical Therapy Center v. Pro–Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2nd Cir. 2002), and *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)). *See also Danjaq*, 263 F.3d at 954 (noting that delay is permissible when the purpose is "to determine whether the scope of proposed infringement will justify the cost of litigation") (quoting *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 831 F. Supp. 202, 219 (D. Mass. 1993)). In this case, there is evidence that AMM chose not to sue immediately upon learning of ULC's use of its mark as a domain name because it did not appear that the infringing conduct had caused consumer confusion or otherwise given rise to cognizable injury. ULC has not shown that AMM's decision to wait until "the likelihood of confusion loom[ed] large" was unreasonable (*Sara Lee*, 81 F.3d at 462) nor has it shown that the delay was unreasonable as a matter of law under the six-factor test adopted by the Ninth Circuit (*Tillamook Country Smoker*, 465 F.3d at 1108).[4]

Given the failure to show that AMM's delay in filing its counterclaims was unreasonable

---

[4] To determine whether the trademark owner's delay in filing suit was unreasonable, the district court balances the following six factors: "(1) strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior's delay." *Tillamook Country Smoker*, 465 F.3d at 1108 (quoting *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)).

ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 5

as a matter of law, ULC is not entitled to summary judgment on its laches defense. In addition, it has not shown sufficient prejudice to trigger an equitable bar on AMM's federal trademark-related claims. ULC argues that it has suffered both expectations-based and evidentiary prejudice as a result of AMM's delay in filing its counterclaims. *See Danjaq*, 263 F.3d at 955. First, it argues that the delay has unfairly increased the damages at issue. This argument is based on the erroneous premises that ULC's allegedly infringing practices remained the same over the relevant period and that it is now being charged with additional potential liability simply because AMM failed to act more promptly. *See Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984) ("Execuair was prejudiced because it continued engaging in its existing practices, incurring additional liability by reason of Whittaker's failure to take prompt action."). It is not, however, the fact that ULC continued to use AMM's mark as a domain name that triggered a spike in AMM's claimed damages, but rather that ULC utilized AMM's mark in new, more impactful, ways in its visible content and metadata in the years before the counterclaims were filed. These new uses were part of a plan to dilute consumer association of the mark with AMM, to cause consumer confusion, and to chip away at AMM's marketing advantages. The success of ULC's plan, not AMM's delay in filing its counterclaims, caused the vast majority of the damages at issue in this litigation. ULC has no claim to equitable relief where its own, expanding conduct caused the increase in damages about which AMM complains.

With regards to evidentiary prejudice, ULC asserts (a) that its employees no longer remember why ULC acquired the [www.americanmarriageministries.com](www.americanmarriageministries.com) url, why the site was originally routed to ULC's website, or why ULC then chose to host a website on the domain name itself, (b) that AMM will be unable to prove its damage claims with any specificity, and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(c) that ULC's ability to gage secondary meaning at the time the alleged infringement began has been compromised. It is unclear how the absence of a clear memory regarding the details of how or why ULC acquired the subject domain name prejudices ULC. Its founder, president, and presiding chaplain, George Freeman, acknowledges that it is ULC's practice to attempt to gain control of "domain names that include terms relevant to ULC Monastery's ministry" so that it can redirect those domain names back to its own website or create a small satellite website on the domain name. Dkt. # 116 at ¶¶ 11-13. The record shows, and Mr. Freeman acknowledges, that ULC came into possession of the www.americanmarriageministries.com url pursuant to its general practice. *Id*. at ¶ 14. ULC does not explain what information regarding "intent" was lost or how it would impact the analysis. Nor does the fact that AMM may have difficulty proving its damage claims establish prejudice to ULC. ULC's argument regarding the increased difficulty it will have in proving that AMM's mark was not distinctive at the time ULC began using the mark as a domain name has some merit, however. The value of a consumer survey to prove (or disprove) that the mark has acquired secondary meaning depends to some extent on its timeliness. *See FLIR Sys., Inc. v. Sierra Media, Inc.*, 965 F. Supp. 2d 1184, 1209 (D. Or. 2013). To the extent AMM's damage claim is based on the use of its mark as a domain name, there is some potential for prejudice caused by delay. That delay has not been shown to be unreasonable, however, and the vast majority of AMM's claimed damages arose from ULC's subsequent uses of the mark.

Laches is an equitable doctrine. It differs from a statute of limitations, which bars a cause of action strictly because of the lapse of time, in that it takes into consideration the reasonableness of the time lapse and the prejudice caused thereby. *Danjaq*, 263 F.3d at 955.

ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 7

ULC has not shown that equity should come to its aid in the circumstances presented here.

### 3. Validity of the Trademark

The Lanham Act exposes to liability any person who, without consent, "use[s] in commerce any ... registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services" which is likely to cause confusion. 15 U.S.C. § 1114(1)(a). The holder of the trademark must demonstrate that it has a valid mark and, thus, a protectable interest under the Act. *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002). "Although the plaintiff in a trademark action bears the ultimate burden of proof that his or her mark is valid, federal registration provides '*prima facie* evidence' of the mark's validity and entitles the plaintiff to a 'strong presumption' that the mark is a protectable mark." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (citing 15 U.S.C. §§ 1057(b), 1115(a); *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc*., 408 F.3d 596, 604 (9th Cir. 2005)). If a registration is issued without need to show that the mark has acquired secondary meaning, the registration gives rise to a presumption that the mark is inherently distinctive. *Quiksilver, Inc. v. Kymsta Corp*., 466 F.3d 749, 760 (9th Cir. 2006). If, however, the Patent and Trademark Office requires proof that the purchasing public has come to view the proposed mark as an indicator of origin, the registration gives rise to a presumption of secondary meaning. *Zobmondo Entm't*, 602 F.3d at 1114 n.7. Once the holder establishes that a mark has been properly registered, the burden shifts to the defendant to show by a preponderance of the evidence that the examiner got it wrong and the mark is not protectable. *Tie Tech*, 296 F.3d at 783; *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775–76 (9th Cir. 1981).

In this case, AMM applied to register the mark "American Marriage Ministries" for use

with ordination services in 2014. It had been using that mark consistently since 2009, and there is no indication that any other entity, including ULC, had ever used that phrase to refer to any other source of goods or services at the time the application was filed. The trademark application was twice rejected on the grounds that the mark was not inherently distinctive and that AMM had failed to show secondary meaning. Dkt. # 155-3 at 14 and 44. On the third try, AMM submitted evidence of its exclusive and continuous use of the mark in commerce for over five years, that a Google search of the mark generated results that uniformly referred to AMM, and that over 250,000 consumers had used AMM's services to become ordained. After reviewing this evidence of acquired, rather than inherent, distinctiveness, the mark was registered in January 2016. A presumption therefore arises in favor of the examiner's finding of secondary meaning.

ULC argues, however, that, because the mark was not registered when the alleged infringement began, the presumption of secondary meaning that attached in January 2016 is irrelevant. On the current record, the Court finds that there is a genuine issue of material fact regarding distinctiveness in the period preceding registration. ULC has offered the results of a consumer survey performed in 2019 showing that only 23.33% of the 300 surveyed individuals associated "American Marriage Ministries" with a single organization or company. Dkt. # 115-5 at 5-21. As of 2019, however, ULC had allegedly been utilizing the mark for approximately a year as generic terms in order to dilute the mark's association with AMM. ULC's success in this effort is the primary basis for AMM's trademark claim. Three years before the survey was performed, the Patent and Trademark Office was convinced that the mark had, in fact, become associated with AMM's services. Neither data point is conclusive proof of the mark's

ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 9

association with AMM in the public mind as of 2011 or 2014, but there is a sufficient evidence for a jury to find in AMM's favor on this issue.

**4. Fair Use Defense**

ULC argues that, even if AMM has a protectable mark, its use of the mark was not "commercial," constitutes nominative or descriptive fair use, and is unlikely to cause confusion. While certain uses to which ULC put AMM's mark simply communicated ideas regarding AMM or expressed points of view that required the use of AMM's name (*e.g.*, the publication of a legal ruling regarding AMM), many of the uses were blatantly commercial (*e.g.*, redirecting consumers to its website so they would buy ULC products and services) or implicated the source-identification function of the mark by intentionally blurring AMM's association with ULC and/or its mark. ULC has not shown that it is entitled to dismissal of any of AMM's claims based on its general assertion of non-infringing uses.

**B. Cybersquatting Under the Lanham Act**

AMM has asserted a cybersquatting claim in violation of 15 U.S.C. § 1125(d) based on allegations that ULC used the www.americanmarriageministries.com domain name in bad faith with an intent to profit from the use. There is evidence to support such a claim. As far back as 2014, ULC was scheming "to bury" AMM by using the domain name to confuse consumers and reduce AMM's advantages in certain markets. Dkt. # 80 at 1-4 (June 2014 internal ULC emails noting the value of "American Marriage Ministries" in marketing to non-religious customers, acknowledging that ULC's purpose behind taking over and using the url americanmarriageministries.com was "to bury" AMM, and making plans to rework the website to highlight the term, masquerade as AMM, and "remove currently aggressive references to the

'Universal Life Church' within the site"); Dkt. # 123-14 (April 2014 email from Mr. Freeman, ULC's founder, discussing plans to trademark "American Marriage Ministries" and to substantively use the americanmarriageministries.com url to mislead the public regarding celebrity customers[5]). As discussed above, the expiration of the limitations period for the analogous state law claim gives rise to a presumption of delay for laches purposes. Courts in this circuit have relied on the statute of limitations for state law trademark claims when determining whether plaintiff delayed in asserting a cybersquatting claim. *See Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp.2d 1023, 1035 (C.D. Cal. 2010). In Washington, the analogous limitations period is three years.

   As discussed above, AMM was fully aware of ULC's use of the offending domain name to redirect customers to its own websites as of 2014, yet waited until 2019 to assert its cybersquatting claim. Delay, for purposes of the laches analysis, is therefore presumed. With regards to the reasonableness of the delay, the elements of the cybersquatting claim are materially different than the elements of AMM's Lanham Act trademark claim and impact the reasonableness analysis. Whereas it was reasonable to delay the assertion of a trademark claim because there did not seem to be a likelihood of consumer confusion until approximately 2018, there is no indication that any element of the cybersquatting claim was unmet or that the cybersquatting claim was not actionable in 2014. ULC has, therefore, shown that the delay was not reasonable.

---

[5] Mr. Freeman stated: "("I would like celebrities' photos to http://www.universallifechurchministers.org/ . . . Although Stephen Colbert was not ordained with us he should have his pic placed in universallifechurchministers.org/. . . , stating that he was ordained at http://americanmarriageministries.com/. Hence, we get a PR-4 link back to our AMM.")).

ULC also has the burden of showing that allowing AMM to pursue the claim at this point in time would prejudice it. It relies on the same arguments it raised in conjunction with the federal trademark claim, the first of which is that AMM's delay has dramatically increased the damages at issue. To the extent AMM hopes to recover damages associated with the uses ULC made of the domain name in 2018 under a cybersquatting theory, the wrong is not separate or divorced from the long-known use of the offending url. Thus, by failing to assert its rights over the url in a timely manner, AMM allowed ULC to expand the use of the website, increasing AMM's damages.

AMM argues that, even if its claim for damages arising from the past use of the domain name is barred, it should be permitted to seek injunctive relief. Where, however, "the feared future infringements are identical to the alleged past infringements," the prejudice "to the defendant occasioned by the plaintiff's past delay" is so closely related to defendant's ongoing behavior that laches bars all claims for relief. *Danjaq LLC*, 263 F.3d at 959-60.

**C. Defamation**

AMM's defamation counterclaim is subject to a two-year statute of limitations. AMM argues that the statute does not apply because ULC has made edits to the americanmarriageministries.com website as recently as 2019. It has not, however, identified any defamatory statements other than the publication of allegedly false statements regarding the validity of AMM's ordinations. Those statements were first made in 2014, and AMM was aware of them by December 2014 when it complained to the website host. This claim is time-barred.

**D. Washington Consumer Protection Act**

ULC argues that AMM's CPA claim is entirely derivative of its other claims and subject

to their shorter statutes of limitations. The unfair and deceptive acts of which AMM complains,

however, are sufficiently distinct from the defamatory, infringing, and/or cybersquatting

activities that the CPA's four-year limitations period applies. RCW 19.86.120. AMM has

provided evidence of unfair and deceptive acts occurring after March 26, 2015: a CPA claim

based on those acts is not time-barred.


For all of the foregoing reasons, ULC's motion to dismiss AMM's counterclaims (Dkt. #

114) is GRANTED in part and DENIED in part. AMM's defamation and cybersquatting claims

are time-barred, as is its state law trademark, trade libel, and CPA claims to the extent those

claims arise out of ULC's use of the americanmarriageministries.com url. AMM's other

Lanham Act claims and the state law trademark, trade libel, and CPA claims based on ULC's

conduct within the applicable limitations periods may proceed.


Dated this 7th day of December, 2020.

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART ULC'S
MOTION FOR SUMMARY JUDGMENT - 13